## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| | : | |
| **v.** | : | **Case No. 25-MJ-96** |
| | : | |
| **STANLEY MARQUIS WILLIAMS,** | : | |
| | : | |
| **Defendant.** | : | |

### UNITED STATES' MEMORANDUM IN SUPPORT OF PRETRIAL DETENTION

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this memorandum in support of its oral motion that Defendant Stanley Marquis WILLIAMS ("WILLIAMS") be detained pending trial pursuant to 18 U.S.C. §§ 3142(f)(1)(B), 3142(f)(1)(C), and 3142(f)(1)(E). The United States requests that the following points and authorities, as well as any other facts, arguments and authorities presented at the detention hearing, be considered in the Court's determination regarding pre-trial detention.

### PROCEDURAL HISTORY AND RELEVANT FACTS

### *WILLIAMS' Arrest on May 8, 2025*

As recorded in Metropolitan Police Department ("MPD") Criminal Case Number ("CCN") 25-067-642, on May 8, 2025, at approximately 1:30 a.m., MPD Officers Mays and Jackson were operating a marked police cruiser were travelling northbound in the 1100 block of Holbrook Street, Northeast, when they observed a silver Kia sedan drive through the stop sign at the intersection of Holbrook and Morse Streets, Northeast. The Kia continued eastbound on Morse Street, Northeast, at a high rate of speed. Officers activated their emergency equipment to conduct a traffic stop and the Kia stopped in the 1500 block of Maryland Avenue, Northeast.

MPD officers identified the driver as Stanley Marquis WILLIAMS ("WILLIAMS"), and advised him of the reason for the stop. While looking through the driver's side front window, Officer Mays observed a handgun in plain view on the driver's side floorboard between WILLIAMS' feet. WILLIAMS was removed from the vehicle and detained for officer safety while the handgun was recovered. The handgun was later determined to be a Bersa Thunder .380 caliber handgun bearing serial number 732807, which was loaded with five rounds of .380 caliber ammunition.



WILLIAMS adamantly asserted that he had a license to carry the firearm, but had simply forgotten it at home. Officer Mays conducted a law enforcement query for WILLIAMS' name which revealed that he was not, in fact, licensed to carry a firearm. In addition, WILLIAMS' criminal history check showed three felony convictions; most recently, he was convicted of Robbery in D.C. Superior Court Case Number 2016 CF3 012004.

WILLIAMS was placed under arrest, and the Officers conducted a search incident to arrest. During that search, Officers recovered four vials of an amber in color liquid, which later field tested positive for the presence of Phencyclidine (PCP), from WILLIAMS person. PCP is distributed by dipping cigarettes into vials of PCP, commonly referred to in slang as "dippers," which are then smoked by the user. Numerous "dippers" can be sold from each vial of PCP.



In addition to the vials of PCP, Officers recovered a pill bottle containing 231 round, blue pills marked "M 30." A query of drugs.com revealed that each of these pills contain 30mg of Oxycodone, a schedule II-controlled substance.  During a trial before Judge Kelly in May 2025, undersigned counsel elicited testimony from an expert witness that the prevailing "street price" for Oxycodone pills is $1 per milligram.  Assuming that value, 231 30mg pills would have a street value of approximately $6,930.



Finally, Officers recovered three cellular telephones and $549 in small denominations of United States currency.  WILLIAMS was originally charged in D.C. Superior Court Case Number 2025 CF2 5152, where he was ordered held without bond pending trial  <u>Attachment One</u>.  On May 28, 2025, WILLIAMS was charged by criminal complaint in this case.

### *Search Warrant 25-SW-135*

On May 13, 2025, United States Magistrate Judge G. Michael Harvey signed Search Warrant 25-SW-135, which authorized the search of the three cellular telephones that were seized incident to WILLIAMS' arrest on May 8.  Although the review of the digital extractions from those phones is not yet complete, the initial review has already produced evidence that WILLIAMS was involved in the distribution of controlled substances and the trafficking of firearms.  A summary of the initial review follows.  Since the iMessage communications were seized from WILLIAMS' phones, his side of the conversation appears in green.

a.       On January 24, 2025, WILLIAMS participated in an iMessage conversation during which his customer indicated that they wanted to purchase two "jammers" – a common slang term for Oxycodone pills.





      b.      On March 5, 2025, WILLIAMS received a text message from another person which included a picture of a Glock-style handgun, which the sender identified as a Glock 21 that they were willing to sell for $1,200.



| Native Messages | | | Timestamp: 3/9/2025 10:56:43 PM(UTC+0) | Direction: Incoming |
|---|---|---|---|---|

| Native Messages | | | Timestamp: 3/10/2025 8:30:05 PM(UTC+0) | Direction: Incoming Body: If I give up the 21G I want 12 for it bruh |
|---|---|---|---|---|

| Native Messages | | | Timestamp: 3/10/2025 8:34:07 PM(UTC+0) | Direction: Incoming Body: For da Glock 21 |
|---|---|---|---|---|

      c.      On March 21, 2025, WILLIAMS participated in an iMessage conversation with "Erk Man" – an individual who, based on their communications, frequently supplied WILLIAMS with Oxycodone pills  for resale.  During this conversation, WILLIAMS told "Erk Man" that he had not received all of the Oxycodone pills that he had paid for, and "Erk Man" promised to make it up to him.





d.      On April 25, 2025, WILLIAMS participated in an iMessage conversation about "yerks" – a common slang term for Oxycodone pills derived from the brand name Percocet. During that conversation, WILLIAMS indicates that he has "yerks" available.





e.    On May 1, 2025, WILLIAMS received an iMessage from an individual who was looking for "blues" – a common slang term for blue Oxycodone pills marked "M 30." In addition to legitimate blue "M 30" pills containing Oxycodone, the District of Columbia has seen an influx of counterfeit blue "M 30" pills which contain Fentanyl instead of Oxycodone.[1]



f.    On May 5, 2025, WILLIAMS participated in an iMessage conversation with an individual who wanted 200 of WILLIAMS' "joints," assuming they were the same as the last ones they had purchased from him.

---

[1] The pills seized from WILLIAMS on May 8, 2025, did not immediately appear to be "hand pressed," which is the most visually obvious indicator that they are counterfeit. The pills have been transported to the DEA lab for examination to verify their contents.





g.    On May 7, 2025, the day before his arrest, WILLIAMS engaged in another iMessage conversation with "Erk Man," during which WILLIAMS asked "Erk Man" if he was "straight" – indicating that WILLIAMS had made a purchase wanted to confirm that "Erk Man" had counted the money.



In addition to the iMessage conversations outlined above, WILLIAMS' cell phones included multiple pictures of white, rocklike substance on a digital scales (67.86 grams, 6.96 grams, and 2.94

grams, respectively); a drug ledger kept in the Notes function which indicated the prices that WILLIAMS was charging for various of strains of marijuana (OG, Wookies, Black Diamond), 30mg Oxycodone pills (Perc), and Psilocybin mushrooms (shrooms); and numerous screen-shots of FaceTime conversations wherein handguns are displayed for sale.





***WILLIAMS' Arrest on October 11, 2024***

As recorded in MPD CCN 24-157-891, on October 11, 2024, at approximately 6:09 p.m., MPD Officers were on patrol in the 1200 block of North Capitol Street, Northwest, due to several "sound of gunshots" calls that same day. While on patrol, the officers observed WILLIAMS standing on the sidewalk in front of the Tyler House Apartment Complex. According to the report, Officers saw what appeared to be a bulge in WILLIAMS' waist band, and he turned away from the officers as they approached – a movement referred to by MPD officers as "blading."

The officers detained WILLIAMS to perform a <u>Terry</u> stop and frisk. As they placed WILLIAMS in handcuffs, they noticed a strong smell of PCP on his person. The stop and frisk did not result in the recovery of a handgun, but it did result in the recovery of a package containing a substantial volume of controlled substances. Specifically, officers recovered 15 clear plastic vials containing an amber liquid that field tested positive for the presence of PCP.



The officers also recovered 15.5 grams of white, rocklike substance which field tested positive for the presence of cocaine base, as well as 36 small, pink "zips" each of which contained a white, rocklike substance that field tested positive for the presence of cocaine, and $482.43 in small denominations of United States currency.



Although this arrest did not result in the filing of criminal charges in D.C. Superior Court, the Court may consider the controlled substances seized from WILLIAMS in determining whether his history and characteristics weigh in favor of pretrial detention.

## ARGUMENT

As a preliminary matter, the "rules concerning the admissibility of evidence in criminal trials do not apply to the presentation and consideration of information at the [detention] hearing."  18 U.S.C. § 3142(f). The parties may proceed by way of proffer and hearsay is permitted. Id.; United States v. Smith, 79 F.3d 1208, 1210 (D.C. Cir. 1996). Moreover, the United States is not required to "spell out in precise detail how the United States will prove its case at trial, nor specify exactly what sources it will use." United States v. Martir, 782 F.2d 1141, 1145 (2d Cir. 1986); United States v. Williams, 798 F. Supp. 34, 36 (D.D.C. 1992). A pretrial detention hearing should neither be a mini trial, nor used as a subterfuge to obtain discovery. Smith, 79 F.3d at 1210; Williams, 798 F. Supp. at 36.

## 1.    The United States' Bases for Detention

The United States seeks pretrial detention pursuant to Section 3142(f)(1)(C), because WILLIAMS is charged in Count One of the Complaint with Possession With Intent to Distribute PCP and Oxycodone, which carries a maximum penalty of greater than ten years.

The United States seeks pretrial detention pursuant to Section 3142(f)(1)(B), because WILLIAMS is charged in Count Three with Carrying a Firearm During and in Relation to a Drug Trafficking offense, which carries a maximum penalty of life imprisonment.

Finaly, the United States seeks pretrial detention pursuant to Section 3142(f)(1)(E), because WILLIAMS is charged in Count Two with Unlawful Possession of Firearm by a Person Convicted

of a Crime Punishable by Imprisonment for a Term Exceeding One Year, which is a felony firearms offense.

Counts One and Three each carry a rebuttable presumption in favor of pretrial detention. 18 U.S.C. §§ 3142(e)(3)(A) and (B).  The rebuttable presumption "'operate[s] at a minimum to impose a burden of production on the defendant to offer some credible evidence contrary to the statutory presumption.'" Id. at 124-25 (quoting United States v. Alatishe, 768 F.2d 364, 371 (D.C.Cir.1985) (original emphasis); see also United States v. Portes, 786 F.2d 758, 764 (7th Cir.1985) (the presumption requires the defendant to come "forward with some evidence that he will not flee or endanger the community if released") (internal quotation and citation omitted)). As this Court has held, the defendant must present evidence to rebut the presumption. United States v. Lee, 195 F. Supp. 3d 120, 124, 125 (D.D.C. 2016).

Moreover, even if WILLIAMS presents evidence to rebut the presumption, the presumption does not disappear entirely. Id. at 125 (citing United States v. Ali, 793 F. Supp. 2d 386, 388 n.2 (D.D.C. 2011) (noting that the Bail Reform Act requires the Court to consider the rebuttable presumption as a factor even if the Defendant "produces credible evidence" to rebut it); United States v. Bess, 678 F. Supp. 929, 934 (D.D.C. 1988) ("[The presumption] is incorporated into the § 3142(g) factors considered by the court when determining whether conditions of release can be fashioned or whether the defendant must be detained pretrial.")) The rebuttable presumption remains as a factor that must be considered by the Court, because it "'reflects Congress's substantive judgment that particular classes of offenders should ordinarily be detained prior to trial.'" Id. (quoting United States v. Stone, 608 F.3d 939, 945-46 (6th Cir. 2010)) (emphasis added).

**2.    The Bail Reform Act Factors All Favor Detention Given WILLIAMS's Risk of Dangerousness to the Community**

As the Court is aware, 18 U.S.C. § 3142(g) enumerates four factors that the Court should analyze in determining whether to detain the defendant pending trial: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the defendant; (3) his history and characteristics; and (4) the nature and seriousness of the danger to any person or the community that would be posed by his release. Each of these factors weighs in favor of pretrial detention in this case.

**A.    The Nature and Circumstances of the Offenses Weigh in Favor of Detention**

The Nature and Circumstances of the charged offenses weigh heavily in favor of pretrial detention in this case. This Court does not need a reminder from the United States of the dangers inherent in armed drug trafficking — particularly related to substances such as PCP and Oxycodone. Moreover, WILLIAMS' recent arrest history and the contents of his cellular telephones indicate that his conduct on May 8, 2025, was not an anomaly. He is clearly in the business of selling hard drugs while armed with a firearm – the very class of offenders who should be detained prior to trial.

**B.    The Weight of the Evidence Against the WILLIAMS Favors Pretrial Detention**

The evidence of WILLIAMS's guilt is incredibly strong and weighs in favor of detention. WILLIAMS was the sole occupant of a vehicle during a traffic stop, and the handgun was observed in plain view on the floorboard near his feet. The PCP and Oxycodone were recovered from his person during a search incident to his arrest, and the contents of his cellular telephones – which were searched pursuant to a Search Warrant – clearly demonstrate his intent to distribute those substances.

**C.    WILLIAMS's History and Characteristics Weigh in Favor of Detention**

WILLIAMS' history and characteristics also weigh in favor of detention. WILLIAMS' first adult conviction resulted from his arrest on July 30, 2012, when he was charged with Burglary Two in D.C. Superior Court Case Number 2012 CF2 13210. WILLIAMS pled guilty to the lesser offense

of Attempted Burglary Two and was sentenced to 12 months' confinement, followed by three years' supervised release. That same day, WILLIAMS was sentenced to 60 days' confinement in Case Number 2012 CF2 22001 for Contempt, based on his violation of a pretrial release condition in 2012 CF2 13210.

On July 28, 2016, while on parole and supervised release for his 2012 convictions, WILLIAMS was arrested and charged with Robbery While Armed in D.C. Superior Court Case Number 2016 CF3 12004. Despite his prior Contempt conviction, WILLIAMS was released pending trial. On March 21, 2017, WILLIAMS was re-arrested and charged with Burglary Two in D.C. Superior Court Case Number 2017 CF2 4798. WILLIAMS pled guilty to the lesser offenses of Robbery and Attempted Burglary Two and was sentenced to consecutive terms of 30 months' incarceration and 18 months' incarceration for those offenses. These convictions also resulted in WILLIAMS parole being revoked, and he was sentenced to serve 30 months' incarceration.

BOP Records indicate that WILLIAMS was released on May 26, 2021. Despite having spent the bulk of nine years' time between 2012 and 2021 detained or incarcerated, WILLIAMS returned to criminal enterprise rather than pursuing legitimate employment.[2]

**D.    The Danger to the Community Created by WILLIAMS's Release Weighs in Favor of Detention**

The D.C. Circuit has noted that "'[w]hen the Government proves by clear and convincing evidence that an arrestee presents an identified and articulable threat to an individual or the community,'" pretrial detention is available to "'disable the arrestee from executing that threat.'" United States v. Munchel, 991 F.3d 1273, 1280 (D.C. Cir. 2021) (quoting United States v. Salerno,

---

[2] The Pretrial Services Report includes WILLIAMS' assertion that he is self-employed at a business entitled "Set Up Before You Fall, LLC." There is no record of a business by that name having been formed in either the District of Columbia or the State of Maryland.

481 U.S. 739, 755 (1987)). This requires the Court to make a "forward looking determination" about the Defendant's risk of danger to the community, keeping in mind that detention may be justified even if the Court does not explicitly find that Defendant is a risk of committing acts of violence. United States v. Hale-Cusanelli, 3 F.4th 449, 456 (D.C. Cir. 2021) (citing Munchel, 991 F.3d at 1283). WILLIAMS poses an obvious and articulable threat to the community. Specifically, the threat posed by WILLIAMS is that he will continue to engage in the distribution and possession with intent to distribute dangerous and highly addictive narcotics while armed with a firearm.

## CONCLUSION

WILLIAMS is eligible for pretrial detention, and his charges carry a rebuttable presumption in favor of pretrial detention. Even if WILLIAMS could present sufficient evidence to rebut the presumption, all four of the Bail Reform Act factors weigh in favor of pretrial detention and Defendant poses a substantial risk of dangerousness to the community if he is released pending trial in this case.

WHEREFORE, the United States respectfully requests that the Court issue an Order granting the United States' motion that the Defendant Stanley Marquis WILLIAMS be held without bond pending trial.

Respectfully submitted,

JEANINE FERRIS PIRRO
United States Attorney

By:     /s/  James B. Nelson
JAMES B. NELSON
D.C. Bar No. 1613700
Assistant United States Attorney
Federal Major Crimes Section
601 D. Street, N.W.
Washington, D.C. 20530
(202) 252-6986
james.nelson@usdoj.gov